## The Fuchs & Lang Manufacturing Company, Defendant in Error, v. R. J. Kittredge & Company, Plaintiff in Error.

### Gen. No. 14,303.

1. CONTRACTS—*what deemed oral.* A contract which is partly written and partly oral is in law an oral contract.

2. CONTRACTS—*what deemed written. Held,* that the correspondence set forth in this case was designed to and did in fact effectuate the making of an entire written contract for the purchase and sale of machinery.

3. CONTRACTS—*law governing enforcement of written.* All prior negotiations, letters and telegrams become merged in a written agreement subsequently formulated and signed; all extrinsic evidence of oral or written negotiations become incompetent, immaterial and irrelevant for the purpose of contradicting or modifying the written agreement.

4. CONTRACTS—*what evidence competent to aid court in ascertaining meaning of particular words.* Prior negotiations merged in a written contract of the parties may be inquired into to determine the meaning of particular words employed in such written contract.

5. SALES—*extent of implied warranty.* Where a manufacturer sells his goods or wares and nothing is said about the quality, he is held to warrant them to be of a fair, ordinary quality, according to their appearance; to this rule there may be a qualification, as when the article is of such a character that ordinary skill cannot ordinarily produce a good article and success depends in a great measure upon chance.

6. SALES—*when warranty cannot be established by parol.* Where an article is sold by formal written contract and the contract is

silent on the subject of warranty, no warranty made at the same time or prior thereto can be shown since the writing is supposed to embody the entire contract; and for the same reason no additional warranty can be engrafted on the contract as written.

7. SALES—*when no implied warranty.* When an article known and described under its patent or other trade name is ordered of a manufacturer, whether ordered for a particular purpose or not, if the known and described thing be actually supplied there is no warranty that it shall answer the particular purpose intended by the buyer.

8. DEPOSITIONS—*when commissioner properly limits scope of examination of witness.* A commissioner appointed to take depositions should limit the examination of the witness to the subject-matter of the order authorizing the taking of such depositions.

9. PRACTICE—*when error in rulings upon propositions of law will not reverse.* Where the Appellate Court is convinced that the trial judge understood and applied the law correctly to the facts proven by the evidence, it will not reverse the judgment even though some of the propositions held by the court are not accurately stated or some of the propositions refused by the court are strictly correct; such erroneous rulings do not affect the judgment if such judgment upon a consideration of the whole record is right.

Assumpsit. Error to the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1908. Affirmed. Opinion filed January 26, 1909.

**Statement by the Court.** The plaintiff in erorr, R. J. Kittredge & Company, by this writ of error seeks to reverse a judgment of the Circuit Court rendered against it in favor of defendant in error for $1,527.50 and costs.

It appears from the record that the Fuchs & Lang Manufacturing Company brought suit in the Superior Court against R. J. Kittredge & Company to recover the price of a certain bronzing machine which the plaintiff claimed it had sold and delivered to the defendant. The case was transferred to the Circuit Court. A jury was waived and the cause was submitted to the court for trial. The court found the issues for the plaintiff and assessed the plaintiff's damages at $1,527.50 and rendered judgment for that amount against the defendant.

The evidence in the record tends to show that the defendant had used in its business a 44-inch Emmerick & Vonderlehr bronzing machine for two or three years, and it had failed to give satisfaction. Defendant had also used a Fuchs & Lang bronzing machine and had discarded it for the same reason. Notwithstanding this, the defendant in April, 1903, and again in May, 1903, wrote to Emmerick & Vonderlehr stating it was in the market for a bronzing machine. It received no reply to these letters. Later, hearing that Emmerick & Vonderlehr had transferred their business to the plaintiff, Kittredge requested Kasch, the local representative of the plaintiff in Chicago, to come to defendant's factory to talk about the purchase of a bronzing machine. Kasch, who was not familiar with the subject, expressed a desire to have Walter Lang of the plaintiff company present, and later in June, Kasch and Walter Lang went to the factory of defendant in Chicago and had some talk with Kittredge and Niemes, defendant's foreman. What occurred during the interview is disputed in the evidence. Later Niemes went to New York and met Ford, the superintendent of plaintiff's factory, and Muller, secretary and treasurer of plaintiff. As to what occurred at the interviews then the evidence is conflicting. After this visit of Niemes to New York, there seems to have been no communication between the parties until July 31, 1903, when the defendant telegraphed from Chicago to plaintiff as follows: "How quick can you ship No. 10 Bronzer?" To this telegram plaintiff replied: "Eight weeks best we can do on No. 10 Bronzer;" and on the same day wrote to defendant the following letter:

"NEW YORK, Aug. 1/03.

MESSRS. R. J. KITTREDGE & Co.,
     Chicago, Ills.

GENTLEMEN :—

We have before us your telegram of inquiry about a No. 10 bronzer. We regret to say that we cannot

possibly make quicker delivery than eight weeks on one of these machines, for the reason that we have so many orders booked ahead for this size.

We assure you that we will do the best we can for you on delivery, in case you place your order with us, to get the machine out within the specified time.

Yours very truly,<br>THE FUCHS & LANG MFG. Co." etc.

Defendant on receipt of the telegram wrote to plaintiff as follows:

"CHICAGO, ILL., Aug. 1, 1903.

FUCHS & LANG MFG. Co.,
   29 Warren St., New York.

GENTLEMEN :—

Your answer to our wire received regarding the No. 10 bronzing machine, and in reply to same we have this to say, that we would like you to look into the matter fairly and see if there is not a way in which you can get us a No. 10 in quicker time than 8 weeks, for if we are to get out the work we have on hand we should have the machine before that time, and should we favor you with an order for a No. 10 we will ask that the alterations or additions as per conversation with Mr. Lang be added. Among these are as follows:

Must have cleaning roller on back of cylinder.

Larger and stronger sieve.

Nippers to take at least 1/2" bite and the belts that are on side must be arranged so that they will not jump off and get caught in the gear, as this is causing us a great deal of trouble with our present machine. The other improvements which you stated to our Mr. Niemes, such as closing up the front, etc., we will expect on the machine.

Let us have your reply by return mail, or just as soon as possible, and we will wire you if we decide to order.

Yours truly,<br>R. J. KITTREDGE & Co.," etc.

To this letter the plaintiff responded as follows:

354     APPELLATE COURTS OF ILLINOIS.

Fuchs & Lang Manu. Co. v. R. J. Kittredge & Co., 146 App. 350.

"NEW YORK, Aug. 3, 1903.
MESSRS. R. J. KITTREDGE & CO.,
    Green & W. Superior Sts.
        Chicago, Ill.
GENTLEMEN :—

We are in receipt of yours of the 1st inst., and in reply beg to state that it would be impossible for us to promise to ship a No. 10 Century Model Bronzing Machine any sooner than eight weeks.

We understand the additions you wish made to the Bronzing Machine are as follows:

You wish a cleaning roller on the back of the cylinder and this we will put on for you.

A larger and stronger sieve we cannot give you entirely. We can give you a coarser and stronger sieve, but cannot change the size.

We will make the gripper to take at least 1/2″ bite, and the belts on the sides will be arranged with flange pulleys so that they will not jump off and get caught in the gearing.

The other improvements shown to your Mr. Niemes will be on this machine, the same as on all we build now, but should there be any other slight modifications which you would want, we would prefer that you write them out for us, so that there may be no mistake when we ship the machine.

You can rest assured that we will do the best we possibly can in order to get this order out for you on time, if you place it with us, but we do not feel like taking it on a shorter promise than eight weeks, as we would not want to disappoint you.

Hoping you may see your way clear to send us this order, and awaiting your kind reply, we remain
                    Yours very truly,
            THE FUCHS & LANG MFG. Co.", etc.

On August 28, 1903, the defendant wrote to plaintiff the following letter:

"CHICAGO, Aug. 28, 1903.
FUCHS & LANG MFG. Co.,
    New York, N. Y.
GENTLEMEN :—
You will please enter our order for delivery quick

as possible or within eight weeks time for one number ten (No. 10) latest model bronzing machine, said machine to have in addition to the regular equipment a cleaning roller at the back of machine to clean the cylinder.

Small driving belts to be arranged with flanged pulleys or otherwise, so as not to jump off and get tangled up in the gearing.

The gripper bite to be at least 1/2 inch.

The guides and tongues to be made in a good substantial manner and more after the pattern used on the regular cylinder presses.

The receptacle for bronze under the sieve to be made larger, or so that a receiving box can be attached.

We would also like to have the fountain enlarged either sidewise or perpendicular, so as to hold a larger amount of bronze than the capacity of the No. 8 machine which we have. We think this would be appreciated by all parties who have continuous or constant demand for use of machine.

The driving pulleys should be large as possible, as we desire to run machine with a motor connected with a belt, so as to shift from tight to loose pulley, as we think this method is better than direct connected or starting and stopping by shutting off and on of the current.

We wish to call your attention to the fitting of screws and bolts throughout the entire machine, they should be made so that it would be nearly impossible for them to work loose and drop out. We have just had a quite serious break on our No. 8 machine, caused by the bolts working loose on the tumbler rod bracket, and your Mr. Walter Lang will also recollect that the small machine the writer and he were looking at in the Donnelly plant was broken down from a like occurrence.

We should like to have the scrapers for the dusting rollers made adjustable.

There should also be some provision made in the shape of a pan or shelf in the front or lower part of the machine so that the bronze will not fall upon the pile of bronzed sheets every time any of the doors were opened.

We have delayed ordering this for two reasons, the first reason being that our friends the Chicago Colortype Co. kindly loaned us their machine and helped us out materially, the second reason is that we are not thoroughly satisfied with the manner in which the machines operate, the delivery device is, in our opinion, too frail and not positive enough for places where the machine is used ten hours a day. We have had frequent stops on account of machine not delivering sheets properly, which has made the output as low as 3,000 sheets a day. We think that an improvement could be made by putting a positive drive on the delivery plush roller and more substantial stripping fingers and connections.

Please advise us by return mail what will be the prospects at this writing for an early delivery, and oblige

Yours truly,

R. J. Kittredge & Co.", etc.

In answer to this, plaintiff sent by Kasch the following letter to defendant:

"Chicago, Sept. 2nd, 1903.

Messrs. R. J. Kittredge & Co.,

107 Superior street,

City.

Gentlemen:—

We beg to acknowledge receipt of your kind order of Aug. 28th sent to our New York house, for one No. 10 latest model Bronzing Machine, and thank you for this order. In regard to the changes and alterations which you wish made on this machine, as per your letter of Aug. 28th, we beg to advise that we will make all the changes we enumerate below, viz.:

Put dusting roller in the back Cylinder to clean same, in place of the regular bristle brush.

Put double Flange Pulleys on all Dusting Rolls, to prevent the Belt jumping off, and getting tangled in the gearing.

Make cylinder so that the Grippers will take at least a half inch bite.

Put on our New Style Guides and Tongues, the Guides being very much heavier, and easier of adjust-

ment, and more after the pattern of a Press Guide, than those on the old No. 8 Bronzer, which you now have.

Make alterations in the receptacle, under Bronze Sieve, so that same can be used to convey the Bronze into a separate Box, which you are to furnish.

O. K. Kittredge.

We will not be able to make any alterations on the Fountain, as these parts are standard, and we would not care to make this Fountain larger than it is at present, principally because if more Bronze is put into it, than it will contain at present, the weight would be sufficient to spring the Fountain Roller, making it bear considerably heavier in the center than on the ends, consequently giving an uneven feed of Bronze.

In regard to Large Driving Pulleys:

We beg to state it would be possible for us to put 18″ driving pulleys on this machine, but this would be the extreme limit, and if we put this on we feel certain they would be too small for any ordinary motor. Besides this it would be necessary for you to erect an idler between your motor and the Bronzing Machine so as to raise the pulleys sufficiently high, that it would pass between the yoke or arm holding the shaft and pulleys. That is, with an 18″ pulley the belt would have to run upwards and from the Bronzing Machine in order to clear the yoke. This is all we could do on our machine as we now build it.

Put on as large tight and loose pulleys as yoke will allow and leave room for belt to motor.

If, however, you are willing to go to the additional expense, we could, by making new patterns and castings put a tight and loose pulley on the machine as large as 26″ diameter at an expense to you of $50 net. The disadvantage of this would be that it would be very hard to get at the belting on the machine and it would be impossible to take the belts off of some of the driving wheels, because the tight and loose pulley would be right in front of them. To do this we would have to put the yoke or arm in a different position and have to make an entirely new pattern of it.

The frame of the machine will not stand the change

in the outside hanger so that we could put larger tight and loose pulleys on, but we can furnish you with a large tight pulley on the outside of driving shaft hanger which could be operated with the starting and stopping of motor in a thoroughly satisfactory manner.

We will be careful in building machine to see that all screws, etc., fit perfectly so that no parts will work loose on the machine as mentioned by you.

O. K. Kittredge.

All scrapers are made adjustable, so that this point is O. K.

We will put an angle iron on the inside of door as suggested by your Mr. Niemes in order to prevent the bronze dropping on the bronzed sheets or on the floor every time the doors are open.

Regarding the Friction Gear:

We will put this on although it will be an extra expense to us, but we will do it without extra charge as you request it.

The stripping fingers are made very substantial and heavy on this machine and there is no reason why they should give any trouble whatever in the delivery of sheets.

Kindly go into this matter thoroughly and let us know if everything we have stated meets with your thorough approval, so that everything will be entirely satisfactory when you receive the machine on the above basis. We expect to make shipment to you in eight weeks from Aug. 28, 1903, and will of course hurry delivery just as much as possible.

Very truly yours,

THE FUCHS & LANG MFG. Co.'', etc.

Dic. H. F.

P. S.

Price—Thirteen Hundred Dollars ($1300.—) F. O. B. New York, less 10% special rebate for cash inside of 30 days from date of bill, as stipulated in our letter of July 30th. Bill to bear date of delivery of bronzer to us at our factory.

O. K. Kittredge.''

Kasch went to Kittredge with the letter, and Kitt-

redge after carefully reading the letter and making such changes as he wished by writing on the margin of one page the words: "Put on as large tight and loose pulleys as yoke will allow and leave room for belt to motor;" and by crossing out two paragraphs of the letter, placed the letters "O. K." and signed his name "Kittredge" on each page of the letter at Kasch's request and handed the paper back to Kasch. The paragraphs erased by Kittredge follow immediately the above quoted words placed on margin as copied above.

After procuring the "O. K." of Kittredge the plaintiff proceeded to assemble a bronzing machine and to put on the machine the special attachments provided for in the above document and shipped the machine to the defendant at Chicago, where it was delivered to the defendant within the eight weeks named in the paper so signed.

When the machine was received the defendant took off the crate in which it was shipped, but made no attempt to use it and never saw it in operation. Kittredge pointed out to Kasch and Fuchs various things which he regarded as objectionable in the machine, and to the request of Kasch that the machine be tried in actual work, replied that he would not put a belt on it unless plaintiff would guarantee it would do the work.

Thereafter plaintiff wrote to defendant the following letter:

"CHICAGO, Nov. 19, 1903.

MESSRS. R. J. KITTREDGE & CO.,
    113 W. Superior St.,
        Chicago, Illinois.

GENTLEMEN:—

Regarding the No. 10 Century Model Bronzing Machine (63 x 64) furnished you, we beg to state that we carried out your stipulations and furnished the latest improved style in every respect. This is our Standard Machine and we guarantee it to work entirely satisfactory, but we cannot be held responsible for any -

new alterations or attachments which you might de-
cide upon to add.

If any defect in the proper workings of Machine
should come up, we will certainly see you through
about same. However, you will surely find everything
all O. K. as this is the same machine of which we have
a large number running with perfect success all over
the country.

Yours very truly,

THE FUCHS & LANG MFG. CO.", etc.

Kittredge, however, continued to make objections to
the machine, and the plaintiff again wrote to the de-
fendant as follows:

"CHICAGO, Nov. 27th, 1903.

MESSRS. R. J. KITTREDGE & CO.,
    Chicago, Ill.
GENTLEMEN :—

In reference to the large Bronzing Machine fur-
nished you this month, we give you the following
guarantee, viz.:

That it works perfectly satisfactory and that no
parts on it are faulty. That is, if any parts will give
out on account of inferior or faulty construction, we
will replace same free of charge, but we cannot be held
responsible for any damage done through accidents
or ordinary wear and tear. We guarantee the con-
struction of the Machine to be perfect, but cannot
guarantee against mishaps which are liable to happen
with any other Machine during the use of same in
course of time. Anything which might prove to be a
fault in construction we are willing to stand by.

If this is satisfactory to you, please put the machine
into use, otherwise return it to our Factory (Ruther-
ford, N. J.) safely packed.

Yours very truly,

THE FUCHS & LANG MFG. CO.", etc.

After the receipt of this letter by the defendant it
appears that Kittredge, Fuchs and Kasch had several
conversations the purport of which is in controversy,
but Kittredge testifies: "I told them this wouldn't
do; I wouldn't send the machine back, nor go to the
expense of boxing and shipping it." On December

30, 1903, defendant wrote to plaintiff a letter of considerable length which indicates no willingness or intention on the part of the defendant to box up or return the machine.

After receiving the letter plaintiff wrote to the defendant as follows:

"CHICAGO, Jan. 14th, 1904.
MESSRS. R. J. KITTREDGE & Co.,
    Chicago, Ill.
GENTLEMEN:—

Yours of Dec. 30th, 1903, came duly to hand and in the meantime we went very thoroughly into the matter of your Bronzing Machine and have found that your claims are not justified. On Nov. 27th we made you a proposition and in accordance with same you should have returned the machine at once if our guarantee was not satisfactory to you. Inasmuch as we did not hear anything from you for over a month, we of course had to take it for granted that you accepted the machine subject to our guarantee of Nov. 27th, which is certainly very liberal and as thorough as any machinery manufacturer would give.   *   *   *

We do not feel that we are obliged to take this machine back at all at this late date, having furnished what we agreed to furnish and really think that we ought to receive remittance covering our bill. However, rather than have any trouble with you about this matter, we now make you the following proposition:

You can return the machine via Erie Despatch prepaid, to the Fuchs & Lang Mfg. Co., Rutherford, N. J. You to thus stand the freight both ways and furthermore send us a check for $100 to cover our actual cash outlay for changes which we made according to your stipulations.   *   *   *   Of course the machine must be boxed and packed by you in as safe and perfect manner as you received it and safe delivery guaranteed by you to Rutherford.

Should this proposition not meet with your approval we must respectfully ask you to send us settlement for the amount of our bill of Nov. 6th.

Yours very truly,
    THE FUCHS & LANG MFG. CO.", etc.

On February 18, 1904, about one month after the letter of January 14, 1904, was written, the plaintiff put its claim in the hands of Chicago attorneys to bring suit against the defendant, and supposed suit had been entered until May, 1905, when it learned that no suit had been started. Meanwhile, on November 19, 1904, defendant wrote plaintiff that "Unless otherwise instructed, we will on December 1st box and ship the bronzing machine which we have been holding subject to your order and risk since last November, back to your address, 29 Warren street, New York, via L. S. & M. S., rendering bill to you for cost of boxing and cartage." And on December 6, 1904, defendant wrote to plaintiff as follows: "As per our letter of 19th ult. to which we have received no reply, we have boxed and shipped the bronzing machine as stated therein and enclose you herewith B. L. for same, together with bill for cartage and crating."

To these letters the plaintiff replied as follows:

"CHICAGO, Jan. 7th, 1905.

MESSRS. R. J. KITTREDGE & CO.,

Chicago, Ill.

GENTLEMEN:—

We are suprised to receive notice that you have returned to us at New York the Bronzing Machine sold and delivered to you by us some time ago. Before this machine was returned, we had notified you that we insisted on your living up to your contract and had brought suit against you for the price of the machine.

Furthermore, the machine arrived in New York in damaged condition on account of being insufficiently packed or crated, as is claimed by the railroad company. We cannot take this machine back and therefore are holding it at our factory subject to your order.

Yours truly,

THE FUCHS & LANG MFG. CO.", etc.

It also appears from the evidence that prior to the return of the machine Walter Lang had told Kitt-

redge over the telephone that the plaintiff would not accept the machine and had brought suit therefor.

SIMMONS, MITCHELL & IRVING, for plaintiff in error.

MUSGRAVE, PLATT, VROMAN & LEE, for defendant in error.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The first question to be determined in this case is, whether or not there was a contract in writing between the parties, as contended by the plaintiff, defendant in error, or whether the contract was partly in writing and partly oral, and hence an oral contract, as contended by the defendant, plaintiff in error.

Upon a careful consideration of all the evidence we are of opinion that the letter of September 2, 1903, as modified by Kittredge and signed by him, was, and was intended by the parties to be, their written contract for the sale and purchase of the bronzing machine. Up to the time of the presentation of that letter to Kittredge by Kasch and his endorsements on each page of the letter there was no meeting of the minds of the parties, and no contract between them. It is evident, we think, that the plaintiff prepared the letter carefully, and with the purpose of expressing by its terms what the parties, in their talk and correspondence, had manifested a willingness to agree to. The plaintiff was not content with the mere precaution of expressing in the letter in great detail what it would and would not do, and forwarding the letter by mail directly to the defendant. It adopted the further precaution of forwarding the letter to the manager of its Chicago office with instructions to submit it to Kittredge for his perusal, and to obtain from him his modifications thereon and his approval in writing. This was done; and when Kittredge had indicated in writing his approval thereon it was, in our opinion,

for the purpose of making the paper express the assent of the defendant in writing to the agreement so prepared as the entire agreement between the parties for the sale and purchase of the machine.

It follows legally that this merged all prior negotiations, letters and telegrams in the written agreement thus formulated and signed; and all extrinsic evidence of oral or written negotiations became incompetent, immaterial and irrelevant for the purpose of contradicting or modifying the written agreement. Graham v. Sadlier, 165 Ill. 95.

It was contended, however, on the trial, and it is contended here by the defendant, that the terms "No. 10 model bronzing machine" as used in the agreement, does not mean or refer to the No. 10 Century Model Bronzing Machine, a patented article, described in the pamphlet of the plaintiff containing a diagram of the same, and then being manufactured by the plaintiff and sold by it by that trade name, but that it means a new machine then about to be manufactured by the plaintiff, upon a new model, for which model plans and specifications were then being prepared by the plaintiff. For the purpose of determining the meaning of these words in the contract the trial court properly admitted the previous negotiations between the parties.

We have examined the evidence in the record bearing upon the intent and meaning of the words "No. 10 latest model," as used in the contract, and we are of opinion that the evidence sustains the finding and conclusion of the trial court that the parties had in mind and referred to the No. 10 Century Model Bronzing Machine then being manufactured and sold by the plaintiff in the contract of September 2, 1903, with the modifications and additions specified therein.

In the first place the evidence shows without substantial contradiction that the plaintiff had never gotten out any other cuts or models than these of this Century Model, and had not at that time planned

any later model; and that the plaintiff had at many different times prior to the date of the contract sent to the defendant a descriptive pamphlet showing a cut or diagram of the No. 10 Century Model Bronzing Machine, and likewise containing information as to its weight, etc.

Second. Kasch testifies that when he first talked with Kittredge about selling to defendant a bronzing machine, he—Kasch—took with him a circular showing plaintiff's No. 10 Century Model Bronzing Machine, and showed Kittredge the circular and Kittredge had it before him while they were conversing. Walter Lang testifies that the conversation which he had with Kittredge in June, 1903, was about the No. 10 Century Model Bronzing Machine and that Kittredge then had in his possession the circular of plaintiff containing the diagram of that machine theretofore manufactured by the plaintiff. Muller testifies that he talked with Niemes, defendant's superintendent, in New York about the No. 10 Century Model Bronzing Machine, and that all their conversation was about that machine which the plaintiff was then building. Ford's testimony corroborates Muller's testimony as to the machine talked about with Niemes in New York in June, 1903. The telegram of the defendant to the plaintiff of July 31, 1903, reads: "How quick can you ship number ten Bronzer?" The reply of the plaintiff dated August 1, 1903, says: "Eight weeks best we can do on No. 10 Bronzer." The letter of August 3, 1903, describes it in the same way. The contract itself says, when speaking of the driving pulleys: "This is all we can do on our machine as we now build it."

Third. Walter Lang denies that he said to Kittredge at any time that the plaintiff was then preparing a new model, or a new bronzing machine. The voluminous correspondence between the parties nowhere speaks of a new bronzing machine or a new model of such a machine which the plaintiff was about to

366    APPELLATE COURTS OF ILLINOIS.

Fuchs & Lang Manu. Co. v. R. J. Kittredge & Co., 146 App. 350.

build. If Niemes told the truth to Kittredge when he returned from New York he must have informed him that he had been unable to see any new model of a machine which the plaintiff was about to build, or any drawings, or plan or diagram thereof, for the plaintiff was not getting out, and had not made, any such model or machine, or drawings or designs for the same, according to the uncontradicted evidence in the record. All the correspondence shows that Kittredge had an intimate knowledge of the various parts of the machine which he was proposing to buy, and this is not consistent with the idea that he was buying a new and different machine not theretofore constructed or used and not known to anyone but the plaintiff.

Our conclusion from the evidence is that the parties had in mind the No. 10 Century Model Bronzing Machine as theretofore manufactured by plaintiff and no other machine, and that the words used in the contract applied to that machine and described it.

The defendant urges that the plaintiff, by falsely representing the material fact that the machine was stronger and better throughout than the old Emmerick & Vonderlehr machine which the defendant had, avoided the contract. That Lang made such a representation or expressed such an opinion to Kittredge, he did not deny in his testimony. But, whatever was the nature of such statement, whether it was a warranty or a mere opinion, there is no evidence in the record showing that it was untrue; and we think the court did not err in refusing to hold the propositions submitted based on such statement.

The defendant presents in its evidence several objections to the machine as delivered. The first suggestion is that the belts slipped off and had been caught in, and cut by the gearing of the machine before its delivery, because the pulleys were not properly made to prevent that result. The testimony of Muller and Ford shows that there were no cuts in the

belt at the time of shipment.   Kittredge admitted in his testimony that the pulleys had proper flanges.

Another objection to the machine delivered was that there was a number of cut-outs filled with Babbit metal in the cylinder.   There is no controversy as to this fact in the record.   The evidence shows, however, that it is impossible to cast a cylinder as large as that required on the machine in question free from defects of this character, and that the particular cylinder on this machine was better in this respect than the average cylinder used on the No. 10 Century Model machines. Ford further testified that he had never seen plugs such as those put in the cylinder of the machine delivered work out or become loose; and that the life of the plugs in the cylinder was as good as the life of the cylinder itself.   The testimony, we think, on this point tends to show that the cylinder in question was as good and as durable in practical operation as a cylinder without plugs.

In Misner v. Granger, 9 Ill. 69, the court say on the general proposition here involved, at page 75: "Again, generally, where a manufacturer sells his goods or wares, and nothing is said about the quality, he is held to warrant them to be of a fair ordinary quality, according to their appearance; as, if a manufacturer sell an ax and upon trial it prove to be so hard as to be unfit for use, then the vendor is responsible for the defect.   To this there may be qualifications, as when the article is of such a character that ordinary skill cannot ordinarily produce a good article, but success depends in a great manner upon chance."   We think upon the evidence in the record that the cylinder was at least of the fair average quality according to its kind and a merchantable article. Though it was not an absolutely perfect cylinder, it was as good as can ordinarily be made by the best known methods of manufacture.

The defendant, plaintiff in error, contends that the

construction of the fountain was not what it should have been.

In defendant's letter of August 28, 1903, to plaintiff, objection was made to the fountain used by plaintiff. This point was accordingly covered by the contract in the following language: ''We will not be able to make any alterations on the fountain, as these are standard, and we would not care to make this fountain other than it is at present.''

This objection with a number of others mentioned in plaintiff in error's brief can be considered as valid and worthy of consideration only upon the theory that there was an implied warranty that the machine was reasonably fit for the purposes for which it was manufactured. This is not the law. Where an article is sold by a formal written contract, as we think is the case here, and the contract is silent on the subject of warranty, no warranty made at the same time or prior thereto can be shown, since the writing is supposed to embody the entire contract; and for the same reason, no additional warranty can be engrafted on the contract as written. Seitz v. Brewers' Refrigerating Co., 141 U. S. 510; Telluride Power Co. v. Crane Co., 208 Ill. 218-227; Peoria Grape Sugar Co. v. Turney, 175 Ill. 631; Case Plow Works v. Niles & Scott Co., 63 N. W. 1013. And when an article known and described under its patent or other trade name is ordered of a manufacturer, whether ordered for a particular purpose or not, if the known and described thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. Seitz v. Brewers' R. Co., *supra;* Prideaux v. Bennett, 87 Eng. Com. L. R. 613; Mason v. Chappell, 15 Gratt. 572; Peoria Grape Sugar Co. v. Crane Co., *supra;* Iroquois Furnace Co. v. Wilkin Manf. Co., 181 Ill. 582, 598, 599.

During the progress of the trial the defendant offered evidence tending to show that the driving shaft of the machine delivered to it was turned down or cut

out at a certain point, thus making the shaft imperfect and weak.   The plaintiff, upon affidavit showing that it was surprised by this testimony, and other grounds for the motion, moved the court for a suspension of the trial to enable it to take the depositions of certain witnesses in Rutherford, New Jersey, upon that question.   The court granted the motion and entered an order fixing the time and place for taking the depositions of the witnesses named upon the question of the condition of the driving shaft and the dusting roller belts in the machine shipped to defendant by the plaintiff, and giving the defendant the right to cross-examine the witnesses and to have two witnesses to be selected by it examine the machine and take their testimony respecting the driving shaft. Pursuant to this order of court the depositions of the witnesses were taken and subsequently were read in evidence upon the resumption of the trial.

The record shows that on the examination before the commissioner, after the plaintiff's witnesses had testified that the machine was standing in the same place where it had stood since its return by the defendant and that nothing had been done on it, and its parts were in the same condition as when constructed and shipped and returned to the factory, defendant's counsel requested that counsel and the witnesses whom he proposed to call have an opportunity at once to examine the machine and identify it.   Thereupon the commissioner and counsel and witnesses proceeded to the machine shop and examined the machine.   Upon the resumption of the examination of the witnesses, counsel for the defendant expressed his satisfaction with the opportunity given to make the necessary examination of the machine as to the driving shaft and dusting roller belts, and admitted of record that the driving shaft then in the machine which they had examined was not cut out or turned down, and that the belts on the machine did not touch or interfere with the driving shaft.   The commissioner, however, refused,

upon objection of plaintiff, to permit defendant to show by its witnesses that the machine had been stripped of certain parts and changes had been made thereon and certain facts relative to the identity of the machine, such as fractures in the frame, in regard to which evidence had been theretofore offered on the trial.

It is urged that there was error in not permitting the examination to extend to the facts and features of the machine designed to be brought out by the questions propounded to the witnesses, for the reason that the identity of the machine examined was necessarily within the terms and scope of the order of court under which the testimony was taken. We think, however, this contention of defendant has no substantial foundation, and that no substantial right of the defendant was denied or violated by the refusal of the commissioner to extend the examination beyond the terms of the order of court.

The evidence in the record greatly preponderates in favor of the plaintiff to the effect that the driving shaft was not turned down or cut out as the evidence offered by the defendant tended to show. While we have read the evidence on this subject carefully, we cannot take the time to analyze and discuss it. The testimony on this subject cannot be reconciled in any way. The evidence of the defendant is inherently and mechanically improbable and therefore arrests belief.

We do not think the evidence shows a rescission of the contract by the parties. The offer contained in the letter of plaintiff of November 27, 1903, was not accepted by the defendant. Another proposition was made in plaintiff's letter of January 14, 1904, but this offer was not accepted. The evidence tends to show that both offers were rejected by defendant. The evidence also shows that prior to the return of the machine by defendant it was notified that plaintiff would not accept the machine.

Upon a review of the evidence in the record we are

of opinion that the preponderance of the evidence sustains the judgment rendered, and on the merits of the case it should be affirmed.

It is urged by the plaintiff in error that the trial court erred in its holdings on the propositions of law appearing in the record. We are convinced that the trial judge understood and applied the law correctly to the facts proven by the evidence, and even if some of the propositions of law held by the court are not accurately stated or some of the propositions refused by the court are strictly correct, such errors could not affect the result here, if the judgment, upon a consideration of the whole record, is right. Stone v. Mulvaine, 119 Ill. App. 443, 456; Chicago Hotel Co. v. Baumann, 131 *id.* 324, 329; Lanter v. Hartman, 95 *id.* 80; Niagara Fire Ins. Co. v. Bishop, 154 Ill. 9. It is unnecessary, therefore, for us to discuss the rulings of the court on the propositions of law.

Finding no reversible error in the record the judgment of the Circuit Court is affirmed.

*Affirmed.*